# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

THE CROSSING AT EAGLE
POND, LLC,

       Plaintiff,

                                Civil Action No. 16-13432

v.

                                HONORABLE DENISE PAGE HOOD

LUBRIZOL CORP. and
LUBRIZOL ADVANCED
MATERIALS, INC.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT [#17]

### I.      BACKGROUND

#### A. Procedural Background

On September 19, 2016, Plaintiff The Crossing at Eagle Pond, LLC ("Eagle Pond") brought this products liability action against Defendants Lubrizol Corp. and its subsidiary Lubrizol Advanced Materials, Inc. ("LZAM") (collectively, "Defendants") in the Sixth Judicial Circuit Court for Oakland County, Michigan, alleging Defendants were negligent in designing and selling a defective compound that contributed to leaks that occurred within the plumbing system of an apartment

building owned by Eagle Pond.[1]  (Doc # 1)  On September 22, 2016, Defendants removed this action to the United States Court for the Eastern District of Michigan, based on diversity.  (*Id.*)

This matter is before the Court on Defendants' Motion for Summary Judgment, filed on October 31, 2017.  (Doc # 17)  Pursuant to a Stipulation and Order (Doc # 19), Eagle Pond filed a Response on January 3, 2018.  (Doc # 20) Defendants filed a Reply on January 25, 2018.  (Doc # 21)  Defendants argue that:

(1) Lubrizol Corp. should be dismissed;

(2) Eagle Pond lacks standing to bring this products liability action;

(3) Michigan's Economic Loss Doctrine limits Eagle Pond to damages under the Uniform Commercial Code (UCC) and bars Eagle Pond from seeking damages in tort;

(4) if the Economic Loss Doctrine applies, the four year Statute of Repose contained in Michigan's UCC bars Eagle Pond from pursuing this action;

---

[1] Plaintiff's products liability claim is based on the following theories:  (1) "Failure to manufacture, distribute and sell the material in a condition reasonably safe for use and free of defects"; (2) "Failure to properly warn potential users of the dangers and defective condition of the materials"; (3) Failing to design, manufacture and sell the materials without intrinsic and latent defects that would cause them to result in piping failures upon normal and foreseeable use, and"; (4) "Failing to design, manufacture and sell the materials so that they would not cause the piping to structurally fail upon normal and foreseeable use."  (Doc # 1, Pg. 14-15, ¶ 18(a)-(d))

(5) if the Economic Loss Doctrine does not apply, the three year statute of limitations for products liability claims in Michigan bars Eagle Pond from pursuing this action; and

(6) Eagle Pond's purchase of the Eagle Pond Apartments with knowledge of the leaks in the plumbing system forecloses this products liability action.

For the reasons that follow, Defendants' Motion for Summary Judgment is **GRANTED**.

### B. Factual Background

The Crossing at Eagle Pond, LLC ("Eagle Pond") is the owner of an apartment complex in Walled Lake, Michigan known as The Crossing at Eagle Pond Apartments (the "Eagle Pond Apartments"). Eagle Pond was established by Bleznak Real Estate Investment Group ("BRI Group"), a commercial holding company. In October 2011, the BRI Group purchased the Eagle Pond Apartments from Walled Lake Granite, LLC through five separate, but related, BRI Group owned entities: BRI-W #1, LLC; BRI-W #2, LLC; BRI-W #3, LLC; BRI-W #5, LLC; BRI-W #6, LLC (collectively, the "Five LLCs"). (Doc # 20, Pg. 5) While under the ownership of the Five LLCs, the Eagle Pond Apartments' plumbing system experienced leaks on October 26, 2011; April 15, 2012; March 31, 2013; and June 14, 2013. (*Id.*) The Five LLCs subsequently hired Delta Mechanical to re-pipe the entire Eagle Pond Apartments plumbing system. (*Id.*) Eagle Pond

acquired the Eagle Pond Apartments from the Five LLCs in January 2016. (*Id.*) Eagle Pond is owned by the same owners of the Five LLCs. The Five LLC owners retained the same ownership percentages in the Eagle Pond Apartments each held respectively before the acquisition. Eagle Pond and the Five LLCs are Michigan companies.

Defendant LZAM, a subsidiary of Lubrizol Corp., is the manufacturer of a chemical compound commercially known as FlowGuard Gold. (Doc # 17, Pg. 12) LZAM sells the compound to manufacturers of chlorinated polyvinyl chloride (CPVC) plumbing pipes and fittings. (*Id.*) Lubrizol Corp. is an Ohio corporation with its principal place of business in Ohio. LZAM is a Delaware corporation with its principal place of business in Ohio. (Doc # 1, Pg. 4)

Samples of the failed Eagle Pond Apartment pipes were submitted to Kent Engineering for forensic analysis. (Doc # 1, Pg. 14) The tests performed by Kent Engineering revealed: (1) that the subject CPVC pipe and fittings contained defective materials causing embrittlement; (2) the embrittlement was detrimental to the operation and maintenance of the plumbing system; (3) and the embrittlement was caused by faulty component materials manufactured and provided to the piping manufactured by LZAM. (*Id.*) Neither party contests these facts.

## II.    ANALYSIS

### A. Standard of Review

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). A fact is material if it could affect the outcome of the case based on the governing substantive law. *Id.* at 248. A dispute about a material fact is genuine if, on review of the evidence, a reasonable jury could find in favor of the nonmoving party. *Id.*

The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmoving party must "go beyond the pleadings and … designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. The Court may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Conclusory allegations do not create a genuine issue of material fact which precludes summary judgment." *Johari v. Big Easy Restaurants, Inc.*, 78 F. App'x 546, 548 (6th Cir. 2003).

When reviewing a summary judgment motion, the Court must view the evidence and all inferences drawn from it in the light most favorable to the nonmoving party. *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## B. Applicable Law

Defendants removed this case based on diversity of citizenship. (Doc # 1) In a diversity case, federal courts apply federal procedural law and substantive state law. *State Farm Fire & Cas. Co. v. Stone*, No. 16-12831, 2017 WL 3017538, at *2 (E.D. Mich. July 17, 2017) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 92 (1938)). "'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, 2008 WL 828112, *14 (W.D.Mich.2008) (quoting *NUFIC of Pittsburgh, Pa. v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir.2007) (citation omitted)). If the state's highest court has not decided the issue in question, "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey*

*v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). Michigan law applies to this case. *Vella v. Hyatt Corp.*, 166 F. Supp. 2d 1193, 1197 (E.D. Mich. 2001) ("Generally, a federal court sitting in diversity applies the substantive law of the forum state.").

### C. Standing

Defendants argue that Eagle Pond does not have standing to bring this claim because Eagle Pond has not suffered an injury in connection with the piping at the Eagle Pond Apartments. (Doc # 17, Pg. 21) Eagle Pond argues that it is essentially the successor of the Five LLCs, and received an assignment of the Five LLCs interest in the Eagle Pond Apartments. Eagle Pond adds that this case should be remanded to state court if Eagle Pond lacks standing. The Court finds that Eagle Pond has standing.

A plaintiff must have standing to sue for a federal court to exercise jurisdiction over the matter. *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002). Plaintiff must have suffered (1) an injury in fact that is concrete and particularized, and actual or imminent; (2) fairly traceable to the challenged actions of the defendant; and (3) likely to be redressed by a favorable decision of the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiff bears the burden of establishing the three elements. *Id.* At the summary judgment stage, a plaintiff must provide specific facts to establish standing. *Id.*

Defendants argue that Eagle Pond cannot meet the injury requirement to establish standing because Eagle Pond did not own the Eagle Pond Apartments when the plumbing issues were remedied in June 2013. Defendants base their argument on the deposition testimony of Adam Bleznak ("Bleznak"), one of the owners of the BRI Group, one of the Five LLCs, and Eagle Pond. Bleznak testified that the Five LLCs owned the Eagle Pond Apartments when the plumbing leaks were remedied. (Doc # 20-2, Pg. 128:15-24) Bleznak also testified that Eagle Pond acquired the Eagle Pond Apartments in January 2016. (Doc 20-2; Pg. 58:1-8) Bleznak further testified that there have not been any leaks in the Eagle Pond Apartments piping since the remediation was complete in June 2013. (Doc # 20, Pg. 128:1-14) Defendants do not challenge the other two (causation and redressability) elements of standing, as they would be satisfied if Eagle Pond meets the injury-in-fact requirement. The Court's analysis focuses only on the injury-in-fact element. *See Storey v. Attends Healthcare Prod., Inc.*, No. 15-CV-13577, 2016 WL 3125210, at *3 (E.D. Mich. June 3, 2016) (focusing only on the injury-in-fact element where the other two elements of the standing inquiry were clearly satisfied).

Eagle Pond argues that it is the successor of the Five LLCs, and received an assignment of interests in the Eagle Pond Apartments held by the Five LLCs. Eagle Pond asserts that the conveyance of the Eagle Pond Apartments from the Five LLCs to Eagle Pond was merely a name change for tax purposes. (Doc # 20, Pg. 11)

To support its theory, Eagle Pond directs the Court to aspects of the property conveyance between the Five LLCs and Eagle Pond. First, the Eagle Pond Operating Agreement states that the Five LLC owners retained the same ownership interests in the Eagle Pond Apartments that they had prior to the conveyance. Second, no consideration was passed between the Five LLCs and Eagle Pond because the entities have common ownership. Eagle Pond cites MCL § 211.27a(7)(m), a Michigan taxation of real and personal property statute, which states in part: "Transfer of ownership does not include . . . [a] transfer of real property or other ownership interests among . . . limited liability companies . . . or other legal entities if the entities involved are commonly controlled."

Eagle Pond's theory of common ownership is incorrect. Bleznak's testimony does not support Eagle Pond's position. Bleznak testified that he is only an owner of one of the Five LLCs, and that the LLCs are owned by different members of the BRI Group. (Doc # 20-2, Pg. 57:1-11) While it is true that the owners of the Five LLCs retained the same ownership interests in the Eagle Pond Apartments following the conveyance to Eagle Pond, the property was transferred from five separate and distinct entities with separate, uncommon ownership, to a single entity with common ownership. It is a well-established principle of law that corporate form must be respected. *Seasword v. Hilti, Inc.*, 449 Mich. 542, 547, 537 N.W.2d 221, 224 (1995). Contrary to Eagle Pond's assertions, there was not a transfer of

property between commonly controlled entities. The Five LLCs currently exist separate, and with different ownership respectively, from Eagle Pond.

Eagle Pond alternatively argues that, even if the Five LLCs and Eagle Pond are not commonly controlled, Eagle Pond still has an injury because the Bill of Sale Eagle Pond obtained from the Five LLCs—dated January 1, 2016—assigns the personal property of the Eagle Pond Apartments to Eagle Pond. (Doc # 20, Pg. 13) The Bill of Sale states the Five LLCs were "Grantors" and "Assignors." (Doc # 20-2, Pg. 136) The document also states that the Five LLCs "assign, transfer, convey and set over unto [Eagle Pond] . . . the other *personal property* owned by [the Five LLCs] located at [the Eagle Pond Apartments] and used in connection with the ownership and operation thereof." (*Id.*) Under Michigan law, an assignee "stands in the same shoes of the assignor and acquires the same rights as the assignor possessed." *Prof'l Rehab. Assocs. v. State Farm Mut. Auto. Ins. Co.*, 228 Mich. App. 167, 177, 577 N.W.2d 909, 914 (1998).

Eagle Pond is essentially arguing that this cause of action must be prosecuted by Eagle Pond because it is the "real party in interest," pursuant to Fed. R. Civ. P. 17(a). "The 'real party in interest' is the person who possesses the right or interest to be enforced through litigation, and the purpose of this procedural rule is to protect the defendant against a subsequent action by the party actually entitled to recover."

*RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010). The Court agrees with Eagle Pond.

"Personal property" is "any moveable or intangible thing that is subject to ownership and not classified as real property." Black's Law Dictionary 1233 (7th ed. 1999). A cause of action is a "piece" of intangible property called a "chose in action." *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 821 (6th Cir. 2015). The Sixth Circuit has held that "[c]hoses of action to enforce property rights do not, as a general matter, automatically transfer when the underlying property changes hands." *Id.* (citing *Peters v. Bowman*, 98 U.S. 56, 58-59, 25 L.Ed. 91 (1878) (right to enforce covenant does not run with land); *Ginsberg v. Austin*, 968 F.2d 1198, 1201 (Fed.Cir.1992) (right to recover outstanding rent payments does not run with land); *In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1490 (9th Cir.1985) (right of action under Rule 10b–5 does not automatically transfer when security is sold)); *see also* Restatement (Second) of Contracts § 317 (1981); Restatement (First) of Property § 552 (1944). A party may assign a chose of action to another party by manifesting an intention to transfer the right. *Id.* In other words, a right to sue may be assigned if a party manifests an intention to transfer the right to another party.

Eagle Pond is the real party at interest in this case. The Bill of Sale explicitly states that the Five LLCs intended to "assign, transfer, convey" all rights and interests in the personal property attached to the Eagle Pond Apartments, to Eagle

Pond. (Doc #20-2, Pg. 136) While the Bill of Sale does not explicitly mention any legal claims or a cause of action, it assigns the rights attached to the personal property to Eagle Pond.

Eagle Pond has established an injury sufficient to satisfy the Article III standing requirement. Eagle Pond was assigned all the rights attached to the personal property connected to the Eagle Pond Apartments. The personal property included the cause of action for injuries suffered due to the allegedly defective piping. The right to bring this lawsuit is solely in the possession of Eagle Pond. While the pipes containing LZAM's CPVC compound were removed and replaced by the time Eagle Pond became the owner of the Eagle Pond Apartments, the alleged injury suffered by the Five LLCs, resulting from the defective CPVC compound in the pipes, satisfies the injury requirement. Under Michigan law, a plaintiff has standing whenever there exist a legal cause of action. *Lansing Sch. Educ. Ass'n v. Lansing Bd. of Educ.*, 487 Mich. 349, 372, 792 N.W.2d 686, 699 (2010). Eagle Pond has standing to pursue this action.

## D. Claims Against Lubrizol Corp.

Defendants argue that Lubrizol Corp. should be dismissed from this products liability action because Lubrizol Corp. does not manufacture CPVC compounds or any other components that were used in the Eagle Pond Apartments plumbing system. (Doc # 17, Pg. 21) Defendants assert Lubrizol Corp. does not manufacture

any components used in plumbing systems, and LZAM, a separate entity, manufactures CPVC compounds. (*Id.*) Eagle Pond argues the Court should allow Eagle Pond to obtain evidence to show that the Court should pierce the corporate veil to subject Lubrizol Corp. to potential liability. (Doc # 20, Pg. 7-8) Eagle Pond will stipulate to Lubrizol Corp.'s dismissal if it cannot provide facts sufficient to support piercing the corporate veil. (*Id.*)

In a products liability case, the plaintiff is obligated to produce evidence reasonably leading to the conclusion that the defendant supplied a defective product and that the defect caused the plaintiff's injury. *See Piercefield v. Remington Arms Co.*, 375 Mich. 85, 99, 133 N.W.2d 129, 135 (1965) ("[P]laintiff relying upon the rule must prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains."). Eagle Pond has not provided any facts to show that Lubrizol Corp. designed, manufactured, or sold the allegedly defective CPVC compound that caused the failure in the Eagle Pond Apartments plumbing system.

Under Michigan law, absent abuse of the corporate form, parent and subsidiary corporations are separate and distinct entities. *Helzer v. F. Joseph Lamb Co.*, 171 Mich.App. 6, 9, 429 N.W.2d 835 (1988). The presumption is referred to as the "corporate veil," and it may only be pierced where an otherwise separate corporate entity is used to subvert justice or cause a result contrary to an established

overriding principal of public policy.  *Id.*  Eagle Pond has not attempted to provide any facts which point to an injustice, nor identified any public policy to allow a piercing of the corporate veil to hold Lubrizol Corp. liable.  Lubrizol Corp. is dismissed from this case.

### E. Claims Against LZAM

#### 1. *Economic Loss Doctrine*

Defendants argue Eagle Pond's products liability claims are barred by Michigan's Economic Loss Doctrine.  (Doc # 17, Pg. 23)  Eagle Pond contends that the Economic Loss Doctrine does not apply to this case because Eagle Pond and Defendants were not involved, directly or indirectly, in a transaction for goods. (Doc # 20, Pg. 15)  The Court finds that the Economic Loss Doctrine applies.

The Michigan Supreme Court formally adopted the Economic Loss Doctrine in *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512 (1992), stating:

> Where, as here, the claims arise from a *commercial transaction* in goods and the plaintiff suffers only economic loss, our answer is "no"—such claims are barred by the economic loss doctrine.
> The economic loss doctrine, simply stated, provides that "'[w]here a purchaser's expectations in a sale are frustrated because the product is not working properly, his remedy is said to be in *contract alone*, for he has suffered only "economic" losses'".  This doctrine hinges on a distinction drawn between transactions involving the sale of goods for *commercial purposes* where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts.

*Id.* at 521 (emphasis added).

The *Neibarger* court held, where a plaintiff attempts to recover for economic loss caused by a defective product purchased for commercial purposes, the remedy is provided exclusively by the UCC. *Id.* at 527–28. This limitation includes the statute of limitations. *Id.* In Michigan, the Economic Loss Doctrine may be applied when a plaintiff is seeking to recover for damage to property other than the defective product. *See id.* at 533-34 (construing the property damages alleged by plaintiff as economic loss). The court explained its policy rationale:

> A contrary holding would not only serve to blur the distinction between tort and contract, but would undermine the purpose of the legislature in adopting the UCC. The code represents a carefully considered approach to governing "the economic relations between suppliers and consumers of goods." If a commercial purchaser were allowed to sue in tort to recover economic loss, the UCC provisions designed to govern such disputes, which allow limitation or elimination of warranties and consequential damages, require notice to the seller, and limit the time in which a suit must be filed, could be entirely avoided. In that event, Article 2 would be rendered meaningless and, as stated by the Supreme Court in *East River [Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)]*, "contract law would drown in a sea of tort."
>
> Rejection of the economic loss doctrine would, in effect, create a remedy not contemplated by the legislature when it adopted the UCC by permitting a potentially large recovery in tort for what may be a minor defect in quality. On the other hand, adoption of the economic loss doctrine will allow sellers to predict with greater certainty their potential liability for product failure and to incorporate those predictions into the price or terms of the sale.

*Id.* at 528.

Eagle Pond argues that the Economic Loss Doctrine should not apply in the absence of privity of contract between Eagle Pond and the Defendants. Eagle

Pond's contention rests on the fact that neither Eagle Pond nor the Five LLCs were in a position to negotiate the sale of the CPVC compound with LZAM. The original owners of the Eagle Pond Apartments constructed the apartments, including the CPVC plumbing system, in 1998 or 1999. (Doc # 20, Pg. 22) The Five LLCs did not become the owners of the Eagle Pond Apartments until October 2011. The right to sue assigned to Eagle Pond was not transferred from a party with privity of contract with the Defendants.

Eagle Pond's privity of contract argument is incorrect. The Michigan Economic Loss Doctrine can apply where there is no privity of contract. *Citizens Ins. Co. v. Osmose Wood Preserving, Inc.*, 231 Mich. App. 40, 45, 585 N.W.2d 314, 316 (1998). In addition, the cases cited by Eagle Pond are unpersuasive.

Eagle Pond cites two cases to support the privity of contract theory. The first case, *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 254 Mich. App. 372, 377-78 (2002), involved a defendant contractor who damaged a water main while working on behalf of his co-defendant. *Id.* The transaction at issue was for services, not goods. The court held that the plaintiff did not have a remedy in contract or commercial law because there was no underlying sale of goods, transaction, or contract between the parties.

*Quest Diagnostics* is unpersuasive because the present case involves the sale of goods. LZAM sold its CPVC compound product for the manufacturing of the

pipes that were subsequently used to construct the Eagle Pond Apartments'
plumbing system. *See Citizens Ins. Co. v. Osmose Wood Preserving, Inc.*, 231
Mich. App. 40, 46, 585 N.W.2d 314, 316 (1998) (finding a sale of goods where
defendant provided only a chemical product). In addition, Defendants are being
sued only as the manufacturers of the CPVC compound. *Id.*

The second case, *River House at Bridgewater Place Condo Association v.
Bridgewater Condos, L.C.*, No. 14-03282-NZB, 2014 Mich. Cir. Lexis 157, at *1-
7 (Kent Cir. Dec. 12, 2014), involved products liability claims brought by individual
condominium owners and their insurers against the defendant plumbing company
and defendant piping manufacturer for installing defective piping containing a
CPVC compound. *Id.* The court held that the Economic Loss Doctrine did not
apply because none of the individual condominium owners nor their insurers were
involved in the contract negotiations with the defendant, and the condominium
owner's expectations could not be satisfied by contractual remedies. *Id.*

*River House* is unpersuasive because it involves claims brought by *individual
owners* of property that had no knowledge or reason to believe that the plumbing in
their condominiums was defective. The present case involves claims brought by a
*commercial* real estate development company that acquired an apartment building.
A subsequent commercial purchaser of an apartment building is not comparable to
an individual owner of a single condominium.

Under Michigan law, a court must consider the "underlying policies of tort and contract law as well as the nature of the damages." *Neibarger*, 439 Mich. at 531. "Application of the economic loss doctrine should not pivot on the type of damage suffered by the plaintiff (e.g. personal injury v. property damage), but rather should turn on considerations such as [1] the use of the product (e.g. commercial v. residential), [2] characteristics of plaintiff (e.g. manufacturer v. private consumer) and [3] policies implicated in the case (e.g. contract law v. tort law)." *Republic Ins. Co. v. Broan Mfg. Co.*, 960 F. Supp. 1247, 1252 (E.D. Mich. 1997).

Eagle Pond has brought this products liability action against Defendants for damages resulting from the costs of replacing the piping throughout the Eagle Pond Apartments complex. The allegedly defective product, CPVC compound, was used for manufacturing pipes that were subsequently used to construct the Eagle Pond Apartments plumbing system. Eagle Pond is a commercial real estate development company, not a private consumer. Finally, "transactions involving the sale of goods for *commercial purposes* . . . are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts." *Neibarger*, 439 Mich. At 521. No individual consumers are involved in this action. The Economic Loss Doctrine applies. This action is governed solely by the UCC.

## 2. *UCC's Statute of Repose*

Article 2 of the UCC provides that a plaintiff must bring an action to recover for economic loss and incidental and consequential damages within four years of tender of delivery of the goods, irrespective of the discovery of the breach. MCL § 440.2725(1)-(2); *Home Ins. Co. v. Detroit Fire Extinguisher Co.*, 212 Mich. App. 522, 525, 538 N.W.2d 424, 426 (1995). Bleznak stated that the Eagle Pond Apartments were built in 1998 or 1999. (Doc # 20-2, Pg. 114:19-23) Under the UCC, the latest Eagle Pond could have brought any claim related to the LZAM CPVC compounds was 2003. Eagle Pond does not dispute that this case should be dismissed if the Economic Loss Doctrine applies. This case is therefore dismissed.

## 3. *Statute of Limitations for Products Liability Actions*

Defendants argue that Eagle Pond's claims are barred by Michigan's three-year statute of limitations for products liability actions even if the Economic Loss Doctrine and the UCC do not apply to this action. (Doc # 17, Pg. 28) Eagle Pond contends that the Complaint was filed prior to the running of the statute of limitations. (Doc # 20, Pg. 22) Neither party disputes that Eagle Pond filed a complaint on March 28, 2016. On June 2, 2016, Eagle Pond and Defendants entered into a tolling agreement, which states that any claims that were barred by March 28, 2016 could not be revived. (Doc #17-5, Pg. 3) Eagle Pond then dismissed the first lawsuit and filed the Complaint in the present action on September 19, 2016. (Doc

# 1)  Eagle Pond contends that March 28, 2016 is at least three days prior to the running of the statute of limitations.  (Doc # 20, Pg. 22)  This Court finds that Eagle Pond's claims are barred by Michigan's statute of limitations for products liability claims.

Michigan law provides a three-year statute of limitations for products liability actions.  MCL § 600.5805(13).  In general, a claim accrues "at the time the wrong upon which the claim is based was done . . . ."  MCL § 600.5827.  "Wrong" under MCL § 600.5827 is "the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which the defendant breached his duty."  *Frank v. Linkner*, 500 Mich. 133, 894 N.W.2d 574, 582 (2017) (quoting *Moll v. Abbott Laboratories*, 444 Mich. 1, 12, 506 N.W.2d 816 (1993)).

Following *Moll*, Michigan has a "possible cause of action" standard for determining when the statutory period starts to run.  *Id.* at 828.  "Once a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action."  *Id.* ("We see no need to further protect the rights of the plaintiff to pursue a claim, because the plaintiff at this point is equipped with sufficient information to protect the claim.").  A plaintiff does not need to know the evidence to establish his cause of action, it is enough that he knows an action exists.  *Id.*  A plaintiff has the responsibility to bring or preserve her claim.  *Kroll v. Vanden Berg*, 336 Mich. 306, 311, 57 N.W.2d 897 (1953).

Leaks occurred in the Eagle Pond Apartments plumbing system on October 26, 2011; April 15, 2012; March 31, 2013; and June 14, 2013. Bleznak testified that he knew of the plumbing leaks when the Eagle Pond Apartments were transferred to the Five LLCs in October 2011. (Doc # 20-2, Pg. 59:18-24) Based on Michigan's "possible cause of action" standard, Bleznak was aware of the harm caused by Defendants' alleged breach by October 26, 2011. Eagle Pond's ability to bring a products liability action against defendants expired in October of 2014.[2]

Eagle Pond argues that despite being made aware of plumbing leaks, the leaks that occurred on October 26, 2011, and April 15, 2012 were "common occurrence[s] in the apartment management business." (Doc # 20, Pg. 24) Eagle Pond contends that those leaks were not "the product liability 'harm' that Eagle Pond suffered" and that the Eagle Pond Apartments were "perfectly able to continue with business as usual." (*Id.*) Eagle Pond adds that the repair of the October 26, 2011 and April 15, 2012 leaks was completed quickly and at a lower cost than the repairs for the subsequent leaks. (Doc # 20, Pg. 25)

According to Eagle Pond, the ruptured pipes at the Eagle Pond Apartments that occurred on March 31, 2013, and June 14, 2014, constitute the "harm" suffered and caused by the alleged product defect because they were larger, more damaging,

---

[2] Eagle Pond was assigned the rights and interest in this cause of action by the Five LLCs when it acquired the Eagle Pond Apartments. See Section II.D.

and more expensive to repair. (Doc # 20, Pg. 27) Eagle Pond contends that the "harms" suffered from the two sets of leaks are not the same because smaller pipes—the pipes involved in the October 26, 2011 and April 15, 2012 leaks—failed regardless of their manufacture or composition, and were quickly and inexpensively repaired. (*Id.*) In contrast, thicker pipe failures—the pipes involved in the March 31, 2013 and June 14, 2013 leaks—evidence a product defect. (*Id.*) The Court disagrees.

First, Eagle Pond's contention that its first harm was the March 31, 2013 leak is unsupported by the Complaint. Paragraph 4 of the Complaint states, "The cause of action that is the subject of this complaint arises out of damages suffered by Eagle Pond arising out of piping failures at the apartment complex (the "piping failures")." (Doc # 1, Pg. 13, ¶ 4) Paragraph 6 states, "Eagle Pond experienced a number of piping failures that caused water damage to the premises." (*Id.* at ¶ 6) Paragraph 7 highlights the damage caused by the June 14, 2013 piping failure. (*Id.* at ¶ 7) The Complaint refers generally to "piping failures," and makes no distinction between the different leaks.

Second, Eagle Pond's harm theory is contrary to Michigan law. Eagle Pond does not dispute that Bleznak was aware of plumbing leaks when the Five LLCs acquired the Eagle Pond Apartments. The October 26, 2011 leak, in addition to the awareness of plumbing leaks at the apartments, means that the statutory period on

Eagle Pond's claim began to run on that date. Eagle Pond argues that the March 31, 2013 leak was the first evidence of a product defect, however, a plaintiff does not need to know the details regarding evidence to support a products liability claim. The Five LLCs began experiencing leaks, and first suffered injury, on October 26, 2011. The cause of action giving rise to this claim began on that date. While the March 31, 2013 and June 14, 2013 leaks might have caused more damage, "the statute of limitations begins to run when the first harm caused by the last act of defendant[] occurred." *Brooks v. Willow Tree Vill.*, No. 294544, 2011 WL 711136, at *4 (Mich. Ct. App. Mar. 1, 2011). Based on undisputed facts, the first harm caused by the allegedly defective CPVC compound sold by LZAM occurred no later than October 26, 2011. There is no genuine dispute of material fact regarding this issue. Eagle Pond's products liability claims are time-barred.

In addition, Defendants argue that Eagle Pond cannot bring this products liability action under a negligence theory because the Five LLCs had actual knowledge of the product defect when they acquired the Eagle Pond Apartments. Eagle Pond argues that Defendants assertion that the Five LLCs had actual knowledge of the product defect is erroneous. Viewing the facts in the light most favorable to Eagle Pond, there are genuine issues of material fact regarding this issue. Because Eagle Pond's claims are time-barred, either under the UCC or Michigan's products liability statute, the Court need not address this issue.

## III. CONCLUSION

Defendants Lubrizol Corp. and LZAM's Motion for Summary Judgment (Doc # 17) is **GRANTED**.

Plaintiff Eagle Pond's claims against the Defendants are **DISMISSED**.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated: September 28, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 28, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager